In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2654

VINCENT INSOLIA, BILLY MAYS, MAUREEN LOVEJOY,
KAREN INSOLIA, PHYLLIS MAYS, and LEE LOVEJOY,

Plaintiffs-Appellants,

v.

PHILIP MORRIS INCORPORATED, R.J. REYNOLDS
TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO
CORPORATION, B.A.T. INDUSTRIES P.L.C., LORILLARD
TOBACCO COMPANY, LIGGETT GROUP, INC., HILL
AND KNOWLTON, INC., THE COUNCIL FOR TOBACCO
RESEARCH-U.S.A., INC., and THE TOBACCO
INSTITUTE, INC.,

Defendants-Appellees.


No. 99-2693

PHYSICIANS PLUS INSURANCE CORPORATION,

Plaintiff-Appellant,

v.

PHILIP MORRIS INCORPORATED, R.J. REYNOLDS
TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO
CORPORATION, B.A.T. INDUSTRIES P.L.C., LORILLARD
TOBACCO COMPANY, LIGGETT GROUP, INC., HILL
AND KNOWLTON, INC., THE COUNCIL FOR TOBACCO
RESEARCH-U.S.A., INC., and THE TOBACCO
INSTITUTE, INC.,

Defendants-Appellees.

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 97 C 347 C--Barbara B. Crabb, Judge.

Argued January 19, 2000--Decided June 16, 2000


  Before BAUER, CUDAHY, and EVANS, Circuit Judges.

  EVANS, Circuit Judge.  If there were such a thing
as moral estoppel, the outcome of this appeal
would be plain. For decades tobacco companies
have assured the public that there is nothing to
fear from cigarettes, yet they now slough off
lawsuits like this one by professing that
everybody knew all along that smoking was risky.

In taking this litigation stance, the cigarette makers either are suffering from amnesia or are acknowledging that their propaganda over the years has been ineffectual. Judicial estoppel, however, applies only to inconsistent positions adopted in litigation, and punishing hypocrisy is something left to a court of another realm. The only issue for us is whether this case was properly snuffed out on summary judgment.

This appeal stems from a lawsuit filed against this country's major cigarette makers and industry trade groups by three former smokers who developed lung cancer that they blame on smoking. All three smokers began smoking long before the first health warnings appeared on cigarette packages in 1965 and all three smoked two to three packs every day for several decades. Vincent Insolia began smoking in 1935, at age 12, and smoked until 1974. Billy Mays began smoking in 1951, at age 13, and continued until 1994. Maureen Lovejoy began smoking in 1953, at age 15, and quit in 1996. The three were diagnosed with lung cancer in the 1990's.

The former smokers and their spouses, all Wisconsin citizens, filed suit in state court but the defendants removed the case to federal court under diversity jurisdiction, 28 U.S.C. sec. 1332. District Judge Barbara B. Crabb extinguished all but one of the plaintiffs' claims on summary judgment, 53 F. Supp. 2d 1032 (W.D. Wis. 1999), and the remaining claim subsequently was dropped. On appeal, the plaintiffs argue that their strict liability, negligence, misrepresentation, and intentional exposure to a hazardous substance claims should have survived summary judgment, and they ask us to certify several questions to the Wisconsin Supreme Court.

We review a grant of summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party. Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 376 (7th Cir. 1998). Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) if there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the party moving for summary judgment uncovers a hole in the opponent's case, the nonmoving party that bears the ultimate burden at trial must show that there is evidence creating a genuine issue of material fact. Id. at 323-25. Material facts are those which might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if a reasonable trier of fact could find in favor of the nonmoving party. Id. The judge must ask whether a fair-minded jury

could return a verdict for the plaintiff on the evidence presented. The existence of a mere scintilla of evidence supporting a plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff. Id. at 252.

We begin with the strict liability claim. Wisconsin law, which governs this case, relies on the Restatement (Second) of Torts in this area. Vincer v. Esther Williams All-Aluminum Swimming Pool Co., 230 N.W.2d 794, 797 (Wis. 1975); Dippel v. Sciano, 155 N.W.2d 55, 63 (Wis. 1967). Section 402A of the Restatement says that one who sells an unreasonably dangerous product is liable for physical harm caused by the product. However, the section's "comment i" explains that this rule "applies only where the defective condition of the product makes it unreasonably dangerous to the consumer . . . . The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Wisconsin courts have restated the Restatement as follows: "If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, it would not be unreasonably dangerous and defective. This is an objective test and is not dependent upon the knowledge of the particular injured consumer." Sumnicht v. Toyota Motor Sales, 360 N.W.2d 2, 16 (Wis. 1984), quoting Vincer, 230 N.W.2d at 798.

The plaintiffs contend that the average consumer at the time in question did not fully appreciate the health risks of smoking, in particular the addictive nature of smoking. We must first define this imaginary "average consumer" and pin down the time in question. The plaintiffs propose that in this context the "average consumer" should be a beginning smoker, maybe even a beginning teenage smoker. The Restatement incorporates the common-sense notion that if a consumer knows ahead of time that a product might be dangerous but goes ahead and uses it anyway, the consumer takes the risk upon himself and the manufacturer will not be held strictly liable. Nicotine's addictive grip makes it difficult to quit smoking. Consequently, the state of knowledge of the average consumer must be measured before the average person is hooked and is no longer capable of making a rational choice. We agree with the plaintiffs that, when it comes to an addictive product like cigarettes, the "average consumer" is the beginning smoker.

The plaintiffs also believe the average consumer should be a teenager because that is when many

people begin smoking and become addicted. The defendants argue that Todd v. Societe Bic, S.A., 21 F.3d 1402, 1408 (7th Cir. 1994) (en banc), holds that children may never be the standard to measure consumer expectations. Todd interpreted Illinois law, which, like Wisconsin, adopted the Second Restatement of Torts, Section 402A. Id. at 1405. In Todd, a 22-month-old child was killed by a fire started by a 4-year-old child using a cigarette lighter that belonged to one of the adults in the household. Id. at 1404. The estate of the deceased child sued the manufacturer of the cigarette lighter, arguing that though the ordinary adult consumer would have appreciated the lighter's danger, children--who were foreseeable users--would not have understood the product's hazards. Id. at 1407-08. The court refused to expand the Restatement's consumer contemplation test from ordinary consumers to foreseeable users. Id. at 1408.

Contrary to the defendants' interpretation, Todd does not mean there is a universally fixed definition of the ordinary consumer that bears no relationship to the product in question. Because the primary consumers, users, and purchasers of cigarette lighters are adults, gauging the perceived risks of cigarette lighters from the average adult's viewpoint makes sense. The same logic holds true even for a product--like diapers--that is used primarily by children but that is purchased and the use of which is supervised by adults. But suppose there was a product-- say, bubble gum--of which children were not only the primary users, but also the primary purchasers, independent of any parental control. It would defy reason to excuse bubble gum manufacturers for bubble-gum-related injuries to children on the grounds that adults who rarely use the product would have appreciated bubble gum's hazards. Likewise, if the facts demonstrate that the ordinary beginning smoker is a teenager, then the consumer contemplation test should be measured from the average pre-smoking teenager's perspective.

Most smokers do begin smoking in their teens, but the record does not reflect this. The plaintiffs failed to introduce evidence that 82 percent of those who have ever smoked daily began smoking before age 18. Centers For Disease Control and Prevention, Morbidity and Mortality Weekly Report, Nov. 8, 1996, Volume 45, No. 45, citing U.S. Department of Health and Human Services, Preventing Tobacco Use Among Young People: A Report Of The Surgeon General (1994). Instead, the plaintiffs pointed to the 1988 Surgeon General's Report on Nicotine Addiction that said tobacco addiction "almost always begins during childhood or early adolescence" and to statistics indicating that about 23 percent of all high

school students and 30 percent to 35 percent of high school seniors in 1958 and 1966 smoked. The Surgeon General's remark is imprecise, and statistics about what percentage of teenagers smoke are not pertinent to the question of what percentage of smokers began smoking as teenagers. Confined by the evidence in this record, we must view the ordinary consumer of cigarettes as a beginning adult smoker.

The second component of the consumer contemplation test we must consider is the time frame. The plaintiffs, oddly, suggest using 1964 as the benchmark. They say this is a convenient measuring stick because it is when the first major Surgeon General report on smoking came out, and public awareness of smoking's hazards would not have been any greater prior to the release of that landmark report. The defendants, equally oddly, advocated at oral argument that consumer awareness be measured at the time the injury was discovered, in other words in the 1990's when the plaintiffs here learned they had lung cancer. The idea behind the consumer contemplation test is that consumers who had their eyes open when they chose to use a potentially dangerous product cannot later blame the manufacturer for their foreseeable injuries. However, consumers who began using a product at a time when the product was thought to be safe are not precluded from holding the manufacturer responsible when they find out years later that--surprise!--the product was toxic. Cigarette companies--along with the makers of asbestos, DDT, and other products that turned out to be bad news--would love a rule that measures consumer awareness only after the damage has been done and the danger thus discovered, but such a rule would be more than a little preposterous. Instead, what the ordinary consumer contemplated about the dangers of smoking should be evaluated at the time the plaintiffs began smoking. For Insolia, that's 1935; for Lovejoy and Mays, that's the early 1950's.

To sum up, the plaintiffs' strict liability claim, at the summary judgment stage, hinges on whether the plaintiffs produced evidence that would allow a reasonable jury to find that average American adults in 1935 and in the early 1950's did not understand the hazards of smoking before they began to smoke.

The plaintiffs made a halfhearted effort in the district court to show that the ordinary consumer, at the time they began to smoke, did not appreciate the general health risks of smoking. Judge Crabb rejected this idea, and the plaintiffs have dropped it on appeal. Other courts also have held that there was common knowledge of the evils of smoking, although the

plaintiffs in many of those cases began smoking at a later date than did the plaintiffs in this case. See Allgood v. R.J. Reynolds Tobacco Co., 80 F.3d 168, 172 (5th Cir. 1996); Roysdon v. R.J. Reynolds Tobacco Co., 849 F.2d 230, 236 (6th Cir. 1988); Guilbeault v. R.J. Reynolds Tobacco Co., 2000 WL 124374, at *9 (D.R.I. 2000); Hollar v. Philip Morris Inc., 43 F. Supp. 2d 794, 807 (N.D. Ohio 1998); Jones v. American Tobacco Co., 17 F. Supp. 2d 706, 718 (N.D. Ohio 1998); Tompkin v. American Brands, Inc., 10 F. Supp. 2d 895, 905 (N.D. Ohio 1998); Todd v. Brown & Williamson Tobacco Corp., 924 F. Supp. 59, 62 (W.D. La. 1996); Paugh v. R.J. Reynolds Tobacco Co., 834 F. Supp. 228, 231 (N.D. Ohio 1993); The American Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 429 (Tex. 1997). But see Hill v. R.J. Reynolds Tobacco Co., 44 F. Supp. 2d 837, 844 (W.D. Ky. 1999) (court denied motion to dismiss because it was unwilling to take judicial notice "of something as intangible as public knowledge over three decades in the past").

The plaintiffs' exclusive argument on appeal is that although the typical consumer was aware that smoking was bad, he or she didn't know back then that smoking was addictive. The idea is that the first cigarettes don't cause cancer, but they do make you crave more cigarettes and those additional cigarettes are the ones that cause cancer down the road. It's really the addiction that kills--not smoking. Several courts have said that whether there is a distinction between knowing about general health hazards and knowing about the danger of addiction is a question of fact that should be decided by a jury. See State of Texas v. American Tobacco Co., 14 F. Supp. 2d 956, 966 (E.D. Tex. 1997) (when facts are viewed in light most favorable to plaintiff, "while the health risks of tobacco consumption are generally known, the addictive nature of tobacco consumption is not generally known due to the concealment and misrepresentation by Defendants"); Castano v. American Tobacco Co., 961 F. Supp. 953, 958 n.1, 959 (E.D. La. 1997); Burton v. R.J. Reynolds Tobacco Co., 884 F. Supp. 1515, 1526 (D. Kan. 1995); Grinnell, 951 S.W.2d at 429-31 ("we cannot simply assume that common knowledge of the general health risks of tobacco use naturally includes common knowledge of tobacco's addictive quality"); Rogers v. R.J. Reynolds Tobacco Co., 557 N.E.2d 1045, 1054 (Ct. App. Ind. 1990).

To get past summary judgment the plaintiffs needed to produce evidence that tobacco's addictive nature--unlike its general health risks--was generally unknown in 1935 and the 1950's. In a world where the amount of information is always expanding, going back in

time to determine the state of public knowledge 50 and 65 years ago is no easy task. But we can think of three types of material that might help show what the ordinary person knew about smoking in 1935 and the early 1950's: Public opinion polls taken during those eras; other contemporaneous assessments of public attitudes; and information widely available to the public through newspapers, magazines, television, or other sources, from which one can infer what the ordinary person might have known.

In the first category of evidence, the only polling evidence was introduced by the defendants and it addresses the public's perception of general health risks, not what the public knew about smoking's addictive danger. (Defense expert Theodore A. Wilson said a 1954 nationwide Gallup poll showed that 89.9 percent had heard or read about the presumed connection between smoking and lung cancer. Wilson also cited a 1960 poll of youths by Scholastic Magazine in which 45.4 percent thought all smokers ran a greater risk of lung cancer than nonsmokers, 19.6 percent thought only heavy smokers ran a greater risk of lung cancer, and 32.2 percent thought there might be some connection but no conclusive link between smoking and lung cancer.)

In the second category the record contains several outside assessments that the public was unaware of nicotine's addictive nature. R.J. Reynolds Tobacco Company research scientist Claude E. Teague wrote in a 1972 planning memorandum that "the things which keep a confirmed smoker habituated and 'satisfied', i.e. nicotine and secondary physical and manipulative gratifications, are unknown and/or largely unexplained to the non-smoker." A Brown & Williamson Tobacco Corporation marketing employee wrote in a 1978 memo that "[v]ery few consumers are aware of the effect of nicotine, i.e., its addictive nature and that nicotine is a poison." The Surgeon General's 1988 report said that many children and adolescents who experiment with cigarettes "are unaware of, or underestimate, the strength of tobacco addiction." One of the plaintiffs' experts, Dr. John Griest, stated in his affidavit: "In my practice dealing with nicotine addicted persons, I have found that most were unaware of the highly addictive nature of cigarette smoke until after they are addicted." Griest's statement is of little value, since it is doubtful that the limited number of patients he has seen is representative of the public at large in 1935 and the early 1950's. Though we are mindful of the difficulty in coming up with evidence that accurately gauges the state of public information several decades ago, two stray lines in industry memos and one sentence in a

government report strikes us as paltry.

In the third category the plaintiffs introduced evidence of information disseminated by the tobacco industry itself. For example, in 1954 the Tobacco Industry Research Committee (which later became the defendant Council for Tobacco Research) took out a full-page advertisement signed by the four defendant cigarette manufacturers that was published in the 448 American newspapers serving cities with populations of more than 25,000 people. Headed "A Frank Statement to Cigarette Smokers," the advertisement said "[w]e accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business. We believe the products we make are not injurious to health." The defendant Tobacco Institute issued a news release in 1988 that said statistics about the number of people who have managed to quit smoking "contradict any claim that smoking is an 'addiction.' . . . The claims that smokers are 'addicts' defy common sense and contradict the fact that people quit smoking every day." In 1994 congressional testimony that received widespread attention, the chief executive officers of each of the defendant manufacturers testified under oath that they did not believe nicotine was addictive. To be sure, the ordinary consumer does not soak up every piece of information that appears in an advertisement, or, for that matter, every word that is printed in a newspaper or uttered by a government agency. But knowing what information was available to the general public gives the fact finder a rough idea of what the ordinary consumer might know.

The plaintiffs rely most heavily on reports issued by the Surgeon General and other medical authorities. The Surgeon General's seminal 1964 report on smoking, for instance, said smoking was habituating, but not addictive. The report compared tobacco to coffee. It was not until 1988 that the Surgeon General declared smoking addictive, comparing tobacco to cocaine. The plaintiffs also offered a report by former U.S. Food and Drug Administration head David A. Kessler that said prior to 1980 no major public health organization had determined that nicotine was an addictive drug. The defendants belittle this evidence as irrelevant, arguing that what government authorities or medical experts say does not reflect what the Average Joe on the street knows. The plaintiffs' point, however, is that if the public health community did not conclude until 1980 or 1988 that smoking is addictive, surely the Average Joe could not have known in 1935, 1951, or 1953 that smoking was addictive. This is a valid inference, and on

summary judgment all inferences are drawn in favor of the nonmoving party.

The evidence in this record that the ordinary consumer at the time the plaintiffs began smoking was unaware of smoking's addictive danger is surprisingly thin. Insolia has the strongest case because he began smoking long before the first Surgeon General's report on smoking and 30 years before the first warnings appeared on cigarette packs. Whether the evidence amounts to a mere scintilla or whether it is enough to overcome summary judgment would be a close call, absent anything else. The plaintiffs have made it easy for us, however, by conceding that the ordinary consumer at the time in question knew that smoking was habit-forming. One of the defendants' proposed findings of fact in the district court was that "[t]he average American has long had the common knowledge of the potential health hazards associated with cigarette smoking and the habit-forming nature of cigarettes." The plaintiffs' response was to "[a]dmit that the average American has been led to believe that cigarettes are merely 'habit-forming' as opposed to 'addictive,' and has not understood cigarettes as highly addictive drug delivery devices."

There might well be, as the plaintiffs argue, a difference between a habit that can easily be broken and a physiological addiction that is difficult to stop. But as Judge Crabb noted, the average consumer would not be preoccupied with the esoteric difference between a "habit" and an "addiction." If the average American knew smoking was habit-forming, the average American knew it would be hard to quit smoking. The fact that the Surgeon General and other authorities called smoking only "habituating" in 1964 and not "addicting" until 1988 is a semantical distinction beyond the grasp of our Average Joe. There is a considerable difference between knowing that smoking is bad and knowing that smoking is addictive, but there is not much of a difference between knowing that smoking is habituating and knowing it is addictive. Once the plaintiffs conceded that the ordinary consumer knew that smoking was habit-forming, they created an enormous burden for themselves that they have not surmounted.

Based on this particular evidentiary record, no reasonable trier of fact could find for the plaintiffs that the ordinary consumer in 1935 and in the early 1950's did not appreciate the health risks of smoking. This decision does not foreclose the possibility that other plaintiffs might prevail on a strict liability claim against the tobacco industry. Another record in another case might be different. Another plaintiff might

marshal better evidence that the haze of the tobacco companies' propaganda obscured whatever health hazards were known to the average consumer. We explicitly reject the tobacco industry's invitation to declare that cigarettes are not unreasonably dangerous. But we do agree with Judge Crabb that the plaintiffs in this case did not meet their evidentiary burden on the strict liability claim.

The next question is whether the plaintiffs' negligence claim also falls prey to the consumer contemplation test. Wisconsin law is not exactly a model of clarity in delineating the difference between strict liability, negligence per se, and ordinary negligence. The best explanation, however, comes from Justice Heffernan's concurring opinion in Greiten v. LaDow, 235 N.W.2d 677, 683-86 (Wis. 1975), which was subsequently adopted as the court's majority opinion in Howes v. Deere & Co., 238 N.W.2d 76, 80 (Wis. 1976).

Interpreting Dippel v. Sciano, 155 N.W.2d 55 (Wis. 1967), Justice Heffernan said that the finding of strict liability under the standards of Section 402A is the equivalent of negligence per se. Greiten, 235 N.W.2d at 684. Negligence per se allows a plaintiff to recover where it is impossible or unduly burdensome to prove that the defendant acted negligently. Id. The plaintiff need not prove fault. Instead, under a negligence per se theory, the plaintiff need only prove that a dangerously defective product caused the harm. Id. at 685. The focus in negligence per se is on the condition of the product, i.e., on the results of the defendant's actions. Id. at 685 n.2, 686.

The focus in ordinary negligence, on the other hand, is on how the defendant created the product, i.e., on the defendant's conduct in attaining the final result. Id. The plaintiff must prove fault. Id. at 686. The plaintiff must prove that the defendant failed to exercise ordinary care and that this failure caused the harm. Id. at 684-85.

In short, negligence per se is about effect, while negligence is about conduct leading to that effect. Negligence-- unlike negligence per se-- requires proving foreseeability. Conversely, negligence per se--unlike negligence--requires proving that the product was unreasonably dangerous.

It is possible for a defendant to be both negligent and negligent per se. "If the lack of ordinary care results in a defective design, it is indeed true that the product may well be

unreasonably dangerous even in the sense of Dippel v. Sciano . . . . Where a plaintiff proves negligence--in this case, the lack of ordinary care in the design of a product--there is no doubt that there may be recovery in the event the defective design results in an unreasonably dangerous product." Id. at 685.

It also is possible for a defendant to be negligent, but not negligent per se. "[T]here may be recovery for the negligent design of a product even though it is not unreasonably dangerous in the 402A sense." Id. As recently as last year the Wisconsin Supreme Court affirmed this position. Sharp v. Case Corp., 595 N.W.2d 380, 387-88 (Wis. 1999).

The issue for us is whether the plaintiffs' negligence claim should go to a jury, even though the consumer contemplation test of Section 402A doomed their strict liability claim. The plaintiffs, naturally, say yes, arguing that their negligence claim revolves around the defendants' conduct in creating a foreseeably hazardous product. The defendants say no, characterizing the plaintiffs' negligence claim as a warmed-over version of their strict liability claim. Judge Crabb categorized the plaintiffs' negligence claim as a "hybrid" that combined components of strict liability (cigarettes are unreasonably dangerous because they are addictive and cause cancer) with components of negligence (the defendants knew when making and selling cigarettes that the product was dangerous). This combination placed the plaintiffs' claim in the negligence per se category, according to the district court, citing Howes, 238 N.W.2d 76. Negligence per se is governed by Section 402A, which shields defendants from liability if the ordinary consumer understood the product's risks, and thus the plaintiffs' negligence (per se) claim fell down the same chute as their strict liability claim.

We disagree with this portion of the district court's thoughtful analysis in this difficult case. First, though closely related to the strict liability claim, the plaintiffs' negligence claim stands on its own. The plaintiffs' negligence claim revolves around the tobacco companies' conduct in producing cigarettes. The plaintiffs contend that while designing, manufacturing, marketing, and selling cigarettes, the defendants could foresee that cigarettes were addictive and cause cancer. The plaintiffs argue that by going forward with the product despite that knowledge, the tobacco companies breached their duty of ordinary care and thus are liable for negligence. Their negligence theory that the defendants were

at fault during the process is independent of their strict liability claim regarding the final result.

Second, even if the plaintiffs' negligence claim contains ingredients of strict liability, we fail to see any mandate in Howes that such a claim must be treated as negligence per se. The plaintiffs in Howes alleged negligence and strict liability: negligence in how the product was designed, manufactured, and marketed; strict liability because the product was allegedly unreasonably dangerous. 238 N.W.2d at 78. In crafting the special verdict and instructions at the close of trial, the court forced the plaintiffs to choose between their negligence and strict liability theories. Id. at 78-79. The plaintiffs went with strict liability and lost. Id. at 79. The Wisconsin Supreme Court reversed, saying that the trial court should not automatically have required the plaintiffs to elect between the two theories because sometimes the submission of both theories to the jury is appropriate. Id.

Over the course of the opinion, what Howes initially terms a "strict liability" claim becomes referred to as "negligence per se." "We here declare that when two grounds of negligence are alleged it does not categorically follow that the plaintiff must always elect one of the two grounds of negligence for submission to the jury . . . . This is especially so when the negligence per se doctrine as formulated in Wisconsin comparative negligence law from sec. 402A, Restatement in Dippel, supra, and common law negligence are both properly pleaded." Id. (footnote omitted). Later, the court concludes that the trial court erroneously thought that "the issues of negligence were precluded by the submission of the case to the jury on the negligence per se doctrine." Id. at 80. Treating negligence per se interchangeably with strict liability is understandable, since the two are close cousins, if not identical twins, under Wisconsin law.

But nowhere does Howes transform the plaintiffs' negligence claim into a negligence per se claim. Throughout the opinion the plaintiffs' negligence claim is consistently called a "negligence" claim. The former smokers' claim of negligent design and manufacture in this case is analogous to the Howes' plaintiffs' negligence claim, not to their strict liability claim. As we read it, nothing in Howes requires categorizing the former smokers' negligence claim as a negligence per se claim.

Perhaps the district court's conclusion that

Howes refashioned the plaintiffs' negligence claim into negligence per se was based upon the following passage:

Greiten v. LaDow, supra, emphasizes that when the claim is based upon negligence, it is necessary to prove what the seller or manufacturer did or did not do; that there was a breach of the duty of ordinary care and that the element of foreseeability was encompassed as an element of proof. It was also pointed out if such proof demonstrated a defective condition unreasonably dangerous to the user or consumer, the product might well fall within the negligence per se doctrine of Dippel, supra.

Howes, 238 N.W.2d at 80. In saying that a negligence case might fall within the negligence per se doctrine of Dippel if the proof of negligence also demonstrated an unreasonably dangerous condition, Howes merely reiterated Greiten's teaching that a defendant could be both negligent and negligent per se, as discussed earlier. Howes goes on to endorse Greiten's explanation of the distinction between negligence and negligence per se--and Greiten made clear that the negligence per se framework had not been imposed upon negligence actions. "Dippel did not intend to apply the dangerously defective standard to an ordinary negligence case. It was not intended to modify or to limit a plaintiff's right to recover, but to extend that right to those circumstances where it was impossible to allege the particulars of negligence. It was not intended that Dippel be transplanted to negligence actions." Greiten, 235 N.W.2d at 684. Consequently, we part ways with the district court's assessment that Howes places the former smokers' negligence claims "squarely within the negligence per se category."

It may seem puzzling that a defendant could be found negligent for designing a product that in the end is not found unreasonably dangerous. Critics point out that "negligence requires a jury to find that the product creates an unreasonable risk of harm to the consumer; if the jury finds that the product does not present an unreasonable danger or defect in the strict products liability sense, then the jury cannot find the manufacturer negligent because the jury cannot logically find an unreasonable risk of harm to the consumer created by the manufacturer's conduct." Sharp, 595 N.W.2d at 388. Supporters argue that "a jury's finding that a defect did not create a quantum of danger reaching the 'unreasonable' level in deciding a strict liability claim does not preclude a finding that a defect existed that could have been discovered and that failure to discover the

defect constituted a breach of a defendant's duty of ordinary care, thereby causing a plaintiff's injuries." Id. Puzzling or not, this is the law in Wisconsin and we are bound to uphold that law. Hansen v. Cessna Aircraft Co., 578 F.2d 679, 682-84 (7th Cir. 1978).

Perhaps what the consumer contemplation test did to the plaintiffs' strict liability claim, the concept of contributory negligence will do to the plaintiffs' negligence claim. That, however, is not for us to decide. Apportioning negligence generally is a question for the jury. See, e.g., Stewart v. Wulf, 271 N.W.2d 79, 84 (Wis. 1978). As a matter of law, the plaintiffs' negligence claims are distinct from their strict liability claims, and the district court erred in stubbing out the former on summary judgment.

We now shift our attention to the plaintiffs' claims that the tobacco companies conspired to fraudulently conceal and misrepresent the health risks of smoking. In contrast to their strict liability claim that necessitated determining only what the generic average beginning smoker knew, the plaintiffs' fraud claims require proof that they specifically relied upon the alleged misrepresentation or that they specifically were victims of the alleged fraudulent concealment. Because none of the plaintiffs could recall a single statement from the tobacco industry about the effects of smoking, Judge Crabb stamped out their original fraud claims for lack of proof of reliance and causation.

In briefing the summary judgment motion, however, the smokers attempted to transform their claim that they were directly defrauded into a claim that the public health community was defrauded and that they in particular suffered as a result. The theory is that cigarette makers concealed information about the addictive qualities of nicotine, consequently the public health community did not recognize until recently that smoking is addictive, consequently no one tried to create smoking cessation products until recently, consequently the plaintiffs were unable to quit smoking sooner, and consequently their chances of avoiding lung cancer were diminished.

Aside from the tenuous and speculative link between the defendants' alleged concealment at the beginning of the chain and the actual injuries to these plaintiffs at the end of the chain, the plaintiffs' new theory runs into another problem--namely, that it is new. "A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996). The

smokers insist that their public health community theory was not cooked up on summary judgment, but already was lurking in their answers to certain interrogatories. Given the plethora of paper produced by a case like this, bits of information in an interrogatory hardly provides the particularity required of a fraud claim. See Fed. R. Civ. P. 9(b).

Finally, the plaintiffs ask us to recognize a tort claim of "intentional exposure to a hazardous substance" or, alternatively, to certify the issue to the Wisconsin Supreme Court. Federal courts are loathe to fiddle around with state law. Though district courts may try to determine how the state courts would rule on an unclear area of state law, district courts are encouraged to dismiss actions based on novel state law claims. Railway Express Agency, Inc. v. Super Scale Models, Ltd., 934 F.2d 135, 138 (7th Cir. 1991). When confronted with a state law question that could go either way, the federal courts usually choose the narrower interpretation that restricts liability. Birchler v. Gehl Co., 88 F.3d 518, 521 (7th Cir. 1996). Innovative state law claims should be brought in state court. Afram Export Corp. v. Metallurgiki Halyps, S.A., 772 F.2d 1358, 1370 (7th Cir. 1985).

The plaintiffs say they tried to litigate this in state court, but the tobacco companies--as they generally do in cases like this--removed the case to federal court. The plaintiffs are in a predicament because state law in this area is stunted by the ability of tobacco companies to remove cases under diversity jurisdiction. Some tobacco litigation, however, has taken place in state courts. See, e.g., Ramos v. Philip Morris Cos., Inc., 743 So.2d 24 (Fla. Dist. Ct. App. 1999); Small v. Lorillard Tobacco Co., Inc., 679 N.Y.S.2d 593 (N.Y. App. Div. 1998); Grinnell, 951 S.W.2d 420; Horton v. American Tobacco Co., 667 So.2d 1289 (Miss. 1996); Gilboy v. American Tobacco Co., 582 So.2d 1263 (La. 1991); Forster v. R.J. Reynolds Tobacco Co., 437 N.W.2d 655 (Minn. 1989). And even if the plaintiffs are in something of a bind, that does not justify the federal courts imposing a new tort claim on Wisconsin.

That said, there is little indication that Wisconsin courts would recognize the "intentional exposure" claim the plaintiffs espouse. The plaintiffs compare their claim to battery cases in which physical force is not a requirement, citing 19th century cases from other jurisdictions. Commonwealth v. Stratton, 114 Mass. 303, 305-06 (1873); State v. Monroe, 28 S.E. 547, 548 (N.C. 1897). But Wisconsin battery law requires unlawful physical touching and the

use of force or violence. Vandervelden v. Victoria, 502 N.W.2d 276, 278 (Wis. Ct. App. 1993). The plaintiffs compare their claim to nuisance cases, citing Vogel v. Grant-Lafayette Elec. Coop., 548 N.W.2d 829, 834 (Wis. 1996) (nuisance claim for stray voltage injury to cattle), and Jost v. Dairyland Power Coop., 172 N.W.2d 647, 652 (Wis. 1969) (nuisance claim for intentional emission of hazardous chemicals into air that fell on crops). But nuisance requires damage to property. Vogel, 548 N.W.2d at 834. The plaintiffs cite a smattering of other cases that they say recognize similar claims. Bennett v. Larsen Co., 348 N.W.2d 540, 548 (Wis. 1984) (applying pesticides in violation of a criminal statute is negligence per se); Brabazon v. Joannes Bros. Co., 286 N.W. 21 (Wis. 1939) (intentionally spraying a substance toxic to plaintiff may be grounds for a tort claim). But we do not find these cases analogous and we decline to invent what would be a truly novel tort claim in Wisconsin.

We also decline to certify to the Wisconsin Supreme Court the question of whether Wisconsin courts would recognize an intentional exposure to a hazardous substance claim. Certification may be appropriate where there are unresolved questions of existing state law, see, e.g., Hanlon v. Town of Milton, 186 F.3d 831, 835 (7th Cir. 1999); In re Badger Lines, Inc., 140 F.3d 691, 698-99 (7th Cir. 1998); Shirkey v. Eli Lilly & Co., 852 F.2d 227 (7th Cir. 1988), but we simply cannot certify every creative but unlikely state cause of action that litigants devise from a blank slate.

In addition, we decline to certify whether the average consumer for consumer contemplation test purposes should be the adolescent beginning smoker. The plaintiffs waived this issue by failing to raise it in the district court. Regardless, the plaintiffs' scant evidence supporting their strict liability claim would not satisfy the test under even the most favorable definition of the average consumer. Thus, the issue is not controlling and is unsuitable for certification. Hanlon, 186 F.3d at 835. Our decision renders moot the plaintiffs' request for certification on the negligence issue.

Recapping our decision, we AFFIRM the district court's grant of summary judgment on the strict liability, fraud, and intentional exposure to a hazardous substance claims. We also AFFIRM Judge Crabb's decision not to certify any issues to the Wisconsin Supreme Court. However, we REVERSE the grant of summary judgment on the negligence claim and REMAND that portion of the case to the district court for further proceedings. The appellants shall recover their costs in this appeal.

Cudahy, Circuit Judge, concurring in part and dissenting in part. Although the majority presents an insightful commentary on much of the evidence, it seems to me in addressing strict liability to have lost sight of the demands of summary judgment. As we all know, summary judgment requires that, after viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Further, summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a number of the conclusions that the majority accepts as clear simply fail to reach a degree of certitude such that no reasonable juror could conclude to the contrary. In fact, the state of public appreciation of various health risks from cigarette smoking fifty or more years ago is so indeterminate as to make summary judgment on the subject extraordinarily difficult.

To succeed on their strict liability claim, the plaintiffs would have to show that "the average consumer [did not] fully appreciate the attendant risk of injury" associated with smoking. Sumnicht v. Toyota Motor Sales, 360 N.W.2d 2, 16 (Wis. 1984). Under this standard, the central question, in its most general terms, is how detrimental to long-term health did the average beginning smoker fifty years ago view cigarette smoking? Cigarettes were called "coffin nails" as far back as I can remember, but that certainly does not mean that they were firmly linked to cancer fifty years ago. Cigarettes were thought to contribute to various respiratory ailments, and they were believed to be inconsistent with serious athletic training,/1 but a tie to lung cancer or heart disease was not yet in the public mind. In fact, the tobacco companies did their best to keep these links out of the spotlight. In 1954, the tobacco companies got together to publish their notorious "Frank Statement" in which they stated that "there is no proof that cigarette smoking is one of the causes [of lung cancer]. . . . We believe the products we make are not injurious to health." T. Ex. 14145./2 In 1972, the Tobacco Institute patted itself on the back for this disinformation campaign in a memorandum, calling it "brilliantly conceived and executed" and "creating doubt about the health charge without actually denying it." T. Ex. 20987. Thus, it seems that the defendants tried to keep the full risks of cancer from the public. At earlier stages in this litigation, plaintiffs argued that

beginning smokers did not fully appreciate the general health risks--knowing that smoking would likely make a person short of breath or cough-prone is far short of fully appreciating that smoking could likely be fatal. But the majority asserts that the issues of health-risk appreciation have been narrowed to knowledge of addictiveness. Based on the arguments before this panel, I can accept this focus, but I do not believe that limiting the inquiry to awareness of addictiveness gets us closer to granting summary judgment.

In the majority's view, the key part of the strict liability analysis involves the question whether beginning smokers (whether "teenagers" or "adults"--I'll discuss this in a moment) regarded cigarette smoking as either habit forming or addictive--and whether these two attributes are synonyms in the mind of the average beginning smoker. The majority answers this question by first noting the plaintiffs' concession that the average American saw cigarettes as "habit forming"--a quality seen by the plaintiffs as quite distinguishable from "addictive." The majority then makes this concession a lever for summary judgment by describing the difference between a "habit" and an "addiction" as "esoteric." The majority also regards the difference between "habit forming" and "addictive" as "a semantical distinction beyond the grasp of our Average Joe."

Possibly things are that simple, but it is also entirely possible that the ordinary beginning smoker associated "habit forming" with the yen for bon-bons, pistachio nuts or cups of coffee but thought of heroin and cocaine when "addiction" was mentioned. The unbreakable bondage to hard drugs was probably in most minds of quite a different order than everyday habits--at least a reasonable jury could so conclude. The plaintiffs did provide some evidence that beginning smokers were unaware that cigarettes were addictive,/3 see, e.g., Supp. App. at 53 (Affidavit of Dr. John H. Greist) ("I have found that most [smokers] were unaware of the highly addictive nature of cigarette smoke until after they are addicted."); T. Ex. 13677 (Brown & Williamson marketing memorandum from 1978) ("Very few customers are aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison."); T. Ex. 12408 (R.J. Reynolds planning memorandum, entitled "The Nature of the Tobacco Business and the Crucial Role of Nicotine," written in 1972) ("[N]icotine and secondary physical and manipulative gratifications are unknown and/or largely unexplained to the [beginning smoker]. He does not start smoking to obtain undefined

physiological gratifications or reliefs, and certainly he does not start smoking to satisfy a non-existent craving for nicotine."), and it seems to me that the state of mind of the beginning smoker on this subject from 1935 to 1960 is not something that lends itself easily to summary judgment--even if the evidence offered by the plaintiffs is not overwhelmingly persuasive.

The majority points to no evidence that suggests that this habit/addiction distinction was "beyond the grasp of our Average Joe." In making this assumption in favor of the defendants, the majority has not only unfairly demeaned the sagacity of the proverbial Joe but has also ignored the mandate of summary judgment that a court draw "all reasonable inferences in favor of the nonmoving party." Anderson, 477 U.S. at 255. Far from thinking it "esoteric," medical professionals have understood the habit/addiction distinction for years, and, until fairly recently, they thought cigarettes were merely "habit forming." Compare A. App. at 56 (1964 Surgeon General's Report) ("In medical and scientific terminology [the smoking process] should be labeled habituation to distinguish it clearly from addiction, since the biological effects of tobacco, like coffee and other caffeine-containing beverages, betel-morsel chewing and the like, are not comparable to those produced by morphine, alcohol, barbiturates, and other potent addicting drugs.") (emphasis in original) with A. App. at 58 (1988 Surgeon General's Report) ("Cigarettes . . . are addicting. . . . The pharmacological and behavioral processes that determine tobacco addiction are similar to those that determine addiction to drugs such as heroin and cocaine."). Whether the Average Joe, beginning smoker regarded cigarettes as being habit forming or addictive or saw no distinction between these two concepts fifty years ago is the kind of comparative question that should be left to a jury.

Whether the standard beginning smoker should be taken to be a "teenager," as the plaintiffs argue, or an "adult," as the majority determines, also needs to be addressed./4 Here again the requirements of summary judgment seem to be taken lightly by the majority. The majority makes the curious statement that "[m]ost smokers do begin smoking in their teens, but the record does not reflect this." In other words, it is common knowledge that the typical beginning smoker is a teenager, but somehow the record of this case allows a grant of summary judgment based in part on the thesis that such a smoker is older and better-informed about the dangers of smoking and the addictiveness of cigarettes. Thus, the path

towards summary judgment can be smoothed by adopting factual assumptions somehow more credible than common knowledge. This is very implausible, and there is more than enough evidence to support the hypothesis that beginning smokers became addicted when they were still children without any warning of the powerful addiction to which they were becoming subject. First of all, plaintiffs produced evidence that the tobacco companies themselves targeted teenagers as beginning smokers or were, at the very least, aware that smokers begin in their teens. See, e.g., T. Ex. 10299 (presentation to Philip Morris Board of Directors in 1969) ("The 16 to 20-year old begins smoking for psychosocial reasons."); Supp. App. at 68 (Summary of Expected Expert Testimony of Richard W. Pollay) ("[T]he tobacco industry has long displayed a strategic interest in the youth market."). And although the majority acknowledges that the plaintiffs' evidence shows that "30 percent to 35 percent of high school seniors in 1958 and 1966 smoked," it dismisses this evidence as both "imprecise" and "not pertinent to the question of what percentage of smokers began smoking as teenagers." The majority is correct that this is not direct evidence of exactly how many smokers began smoking as teenagers, but when one considers that the plaintiffs also introduced evidence that only 6 percent of smokers quit each year, see T. Ex. 0054, attached to R.277: Ex. B (Jorenby et al., A Controlled Trial of Sustained-Release Bupropion, a Nicotine Patch, or Both for Smoking Cessation, New Eng. J. Med. 340:9 at 685-91 (May 4, 1999)), a jury could reasonably be left with the conclusion that the vast majority of these high-school smokers kept smoking through their adult lives. Therefore, I believe that the majority was hasty, and wrong, to determine as a matter of law that the "beginning smoker" must mean the "adult beginning smoker."

   For these reasons, I respectfully dissent from the majority's analysis and conclusions respecting strict liability.

FOOTNOTES

/1 But cigarette advertising certainly tried to convey the opposite. For example, in 1952, the American Tobacco Company ran the following advertisement: "Frank Gifford in Action . . . The young N.Y. Giant halfback was already a top star--and a Lucky Strike smoker." See Supp. App. at 61 (Summary of Expected Testimony of Richard W. Pollay).

/2 Citations to the record come from three sources: (1) appellants' appendix, cited as "A. App. at [page];" (2) appellee's supplemental appendix,

cited as "Supp. App. at [page];" or (3) what would have been plaintiffs' trial exhibits, cited as "T. Ex. [number]." All trial exhibits cited can be found in the record attached as part of Exhibit A to R.277, unless otherwise specified.

/3 The plaintiffs also provided some evidence that cigarette manufacturers were well-aware of the addictive quality of cigarettes but failed to share it with the public. See, e.g., T. Ex. 10299 (report to Philip Morris Board of Directors in 1969) ("[T]he ultimate explanation for the perpetuated cigarette habit resided in the pharmacological effect of smoke upon the body of the smoker."); T. Ex. 259 (internal memorandum by general counsel for Brown & Williamson, 1963) ("[N]icotine is addictive. We are, then, in the business of selling . . . an addictive drug.").

/4 This matters because the plaintiffs produced evidence that the age of the smoker has some bearing on smokers' perceptions. See, e.g., Supp. App. at 69-70 (Summary of Expected Expert Testimony of Richard W. Pollay) ("Cigarette advertising affects teens more than adults," citing articles).